**Reversed and Rendered and Majority and Dissenting Opinions filed May 9, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00644-CV

---

## CITRIN HOLDINGS, LLC AND JACOB CITRIN, Appellants

### V.

## MATTHEW MINNIS AND CULLEN 130, LLC, Appellees

---

**On Appeal from the 133rd District County**
**Harris County, Texas**
**Trial Court Cause No. 2006-78939**

---

### D I S S E N T I N G   O P I N I O N

I respectfully dissent.

In their second issue, appellants assert the trial court erred in overruling appellants' reliability challenge to the testimony of appellees' damage expert. Appellants filed a motion to exclude appellees' expert witness, and the trial court

conducted a *Daubert*[1] hearing, after which the trial court overruled appellants' motion to exclude and allowed the expert to testify. The issue before us is whether the trial court—based on the motion, response, *Daubert* hearing evidence, and argument of counsel—abused its discretion when it overruled appellants' motion to exclude. *See Whirlpool Corp. v. Camacho,* 298 S.W. 3d 631, 638 (Tex. 2009).

At the time of the trial court's ruling on the motion to exclude, the trial court did not have the benefit of the full trial testimony or the post-trial arguments of counsel. In my opinion, based on the record before the trial court at the time of its ruling, the trial court did not abuse its discretion when it overruled appellants' motion to exclude appellees' expert. Therefore, I would overrule appellants' issue two.

It is important to keep in mind that, in issue two, appellants are not raising a "no evidence" challenge; rather, they are complaining that the trial court abused its discretion in making an evidentiary ruling.

Appellants do not complain on appeal that appellees' expert is not qualified, or that his testimony is irrelevant, or that the "direct capitalization" methodology he relied upon is unreliable. The six non-exclusive *Robinson*[2] factors that courts may consider when determining whether expert testimony is reliable, all of which deal with the theory or methodology utilized by the expert, are supported and unchallenged in this case. *See Robinson*, 923 S.W.2d at 557.

The Majority Opinion concludes that the trial court abused its discretion in allowing appellees' expert witness to testify at trial because the expert witness's

---

[1] *Daubert v. Merrell Dow Parms., Inc.*, 509 U.S. 578 (1993).

[2] *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995).

2

**application** of the direct capitalization method was based on unreliable foundational data.

Importantly, nowhere—in the motion to exclude the expert, the response, or the *Daubert* hearing—did anyone, from either side, ever argue that the internal projections or investor summary schedules prepared by appellants' employees were incorrect or unreliable. The only arguments presented to the trial court dealt with whether the projections and schedules reflected the present value, as of March 2007, of the stabilized values.

Appellants' own expert, who testified at the *Daubert* hearing, relied on appellants' internal projections and investor summary schedules as being accurate; his testimony was that, taking the company's financial data as true, it did not reflect March 2007 values, but rather reflected values as of 2009 or 2010. Appellants' expert conceded at the *Daubert* hearing that he had never before valued income producing real estate properties like those involved in this case as an expert, and this was the first time he had testified as an expert witness with respect to any commercial real estate valuation. Further, he testified that he had never done a "direct capitalization method of valuation for a real estate project."

Appellees' expert, whose curriculum vitae is 18 pages long and reflects his extensive experience as an expert in the valuation of income producing real estate ventures, testified, in part, as follows:

Q. . . . You heard Dr. Flores testify yesterday. You were here for that?

A. Yes.

Q. Okay. Dr. Flores, one of the things he said was that you just took the values in the Millennium Investment Committee and you

3

used those as your present value or your current value in March 2007. Is that exactly an accurate statement?

A.    No, it's not.

Q.    What's inaccurate about that?

A.    Well, I think it's a lack of understanding of what I did. I started with the stabilized values and then adjusted the stabilized values.  As is provided, as is used throughout the profession, I adjusted the stabilized values for those costs that would be incurred to reach stabilization.

So we start with stabilized values, deduct those costs that I was referring to and the result is the as-is value, the value in its current state if it's -- it hasn't reached stabilization yet.

Q.    And by doing that, is it your opinion that you calculated the value of those properties as of March 2007?

A.    Yes.

Q.    And another thing Mr. Flores criticized you for was, he said you didn't take into account time value of money.  Do you agree with that criticism?

A.    I do not.

Q.    Why not?

A.    Because -- well, first of all, the stabilized values are – it's the present value of the stabilized value.  So when those stabilized values are prepared, those are prepared as if the property were stabilized in the first quarter of 2007.  That's what those values represent.

Now, it's recognized that they're not stabilized. So then we go through this adjustment process that I've described and so we calculate these costs that are incurred, be it a one-year period or a two-year period and discount those costs to present value.  So we're

4

starting with a present value of a stabilized value, assuming it's stabilized and in making those adjustments taking into account the time value of money, discounting those costs to present value, subtracting the present value of those costs from the present value of the stabilized value which gives you the as-is value for the first quarter of 2007.

Q.    And is the time value of money component, then, in part, at least, implicit in the capitalization rate itself?

A.    It is.

Q.    And then in the other pieces you've talked about in making those deductions, is that how you took into account the issue of time value of money?

A.    It is.

Q.    Another criticism that we heard from Mr. Flores was that you didn't take into account the time it would take these properties to reach stabilization. Do you agree with that?

A.    I do not.

Q.    And what's -- what do you disagree with on that?

A.    I specifically identified based on the information that I had available to me what Cargo Ventures thought or if -- I didn't have it from Cargo Ventures directly, what the appraisers had in their appraisals about how much time was expected to reach stabilization. So in some cases it was a year or two years or three years. And so I took that time period into account, which was used for the discounting purposes, discounting those costs to present value.

Q.    Now, another criticism from Dr. Flores is that his opinion is the discount rate should be then applied on top of -- or in addition to the analysis that you did. Do you agree that you need to add a discount rate into your analysis?

A.    I disagree completely with that.

5

Q. And why?

A. Well, first of all, that is to imply that -- which is an incorrect implication that the values that have been prepared are a future value. They're not a future value which is then discounted.

Q. So even though the stabilized net operating income is going to be achieved at some point in the future, is it your testimony because of the way you did the analysis, the value you arrived at is not a future value? Is that what you're saying?

A. That's right. The value I arrived at is the present value. And it's incorrect to believe that the stabilized value is a value in the future. It's a stabilized value as of the current time frame as if it was stabilized and then making the adjustments as I've described.

Q. And is the income potential of properties like this that goes into the net operating income calculation and the direct capitalization analysis, is that the kind of thing that buyers and sellers out there in the marketplace are interested in with these type of properties?

A. It is.

* * *

Q. Now you're aware that Mr. Citrin's employee, Ms. Aboulhosn now has testified in her deposition in this case that those series of portfolio valuations she prepared back in 2007 were not actually values back in 2007. Are you aware of that testimony?

A. I am.

Q And does that change your analysis or your opinion as to the value in March of 2007 at all?

A. No, sir.

Q. And why not?

A.     Because the values that were being computed were the stabilized values as of 2007.   And the difference between those stabilized values and the fair value at that time would be adjustments that I have made.

* * *

Q.     Anything that you've heard from Ms. Aboulhosn or from Mr. Flores change any of your opinions in this case or make you think that your analysis is flawed or needs to be adjusted in any way?

A.     No.

* * *

**CROSS-EXAMINATION**

Q.     (BY MR. VESELKA)   All right.  On what information in the record, in the sheets, portfolio value calculations, cash flow calculations, do you rely for basing your assumption that the portfolio values of Ms. Aboulhosn's modeling represent stabilized values as of March of '07?

A.     Well, a number of things, including the fact -- I mean, primarily the fact that -- first of all, I understand that Ms. Aboulhosn was provided with the capitalization rate by Mr. Citrin. That is a current capitalization rate. It is understood that if you use the current capitalization rate you can only derive a current value.

We don't know what the cap rates are going to be in the future. We don't know what market conditions are going to be in the future. So we can only determine what the present value is. In this case the stabilized value can only be determined by using the current cap rate, the 6.5 percent that was provided by Mr. Citrin to Ms. Aboulhosn.

* * *

Q.     On what piece of evidence that you reviewed do you rely for rejecting Ms. Aboulhosn's statement, the author of those

7

projections, that the stabilized values are not the present value of those projects that have not yet reached stabilization? . . . You're rejecting her statement of fact that her calculations do not provide a present value for those -- for the stabilized values she uses in those schedules for projects that have not yet been stabilized. You're rejecting that, correct?

A.    Well, I think that -- I think she probably is a little confused in her answer.  She is saying that this is a future value because she recognizes that it's not stabilized, just as I recognize that it's not currently stabilized. So she wants to say this is some value in the future when it reaches stabilization.  But you can't get there by using a current cap rate.  We can't – we can't project what the value is going to be in the future based on the application.  So although she might think what she is doing is a future value, I think the most charitable way to describe is she might be a little confused about what she's doing, because you can't project a value in the future by using a current cap rate.

The trial court's ultimate task is not to determine whether the expert's conclusions are correct, but rather whether the analysis the expert used to reach those conclusions is reliable and therefore admissible.  *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010).  It is clear from the record that the trial court carefully considered all the evidence and arguments of counsel in connection with the motion to exclude.   There was ample evidence to support a reasonable conclusion that the projections and schedules, relied on by both sides, reflected the March 2007 value of the stabilized values, from which the "as is" or "present" value could be determined, and that appellees' expert therefore had a valid foundation for his opinion.  In light of the evidence presented, I cannot say the trial court abused its discretion in overruling appellants' motion to exclude appellees' expert in this case.[3] Accordingly, I would overrule appellants' issue two.

---

[3] I note that the Majority Opinion addresses additional arguments raised by appellants on appeal, but **not** raised by appellants in their motion to exclude or the *Daubert* hearing (valuation

We should address the remainder of appellants' issues attacking the judgment against appellants for breach of fiduciary duty.[4]

/s/          Margaret Garner Mirabal
             Senior Justice

Panel consists of Justices Boyce, McCally, and Mirabal.[5] (McCally, J., Majority)

---

of MMT project; accrual of Millennium's preferred return after March 2007). We cannot fault a trial judge for not considering matters that were not raised for consideration in the trial court. Additionally, I note the Majority Opinion discusses evidence "independent of Bayley's analysis" (Morgan Stanley letter of intent, Opus's valuation); while this additional evidence introduced at trial may be relevant to the sufficiency of the evidence to support the damage finding, appellants' issue two does not raise a sufficiency of the evidence complaint, but rather an evidentiary ruling complaint.

[4] I do not express an opinion regarding the Majority Opinion's analysis under "IV. Fraud"; the alternative judgment for fraud does not come into play unless and until we reverse the judgment for breach of fiduciary duty, which we have not properly done at this point.

[5] Senior Justice Margaret Garner Mirabal sitting by assignment.