

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00832-CV

Osiela G. **VILLARREAL**, Individually and as Representative of the Estate of Jose Rodriguez,
Deceased and as Next Friend of Nayeli M. Rodriguez and Noemi M. Rodriguez, Minor Children
and Marisela Trevino Rodriguez,
Appellants

v.

**TROY CONSTRUCTION LLC**,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2010-CVT-001888-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by: Rebeca C. Martinez, Justice

Sitting: Catherine Stone, Chief Justice
Karen Angelini, Justice
Rebeca C. Martinez, Justice

Delivered and Filed: October 15, 2014

AFFIRMED

This appeal arises from a tragic accident in which Jose Rodriguez died after the pickup truck he was driving collided with a tractor trailer driven by Ricky Wayne Moore, Jr., an employee of Troy Construction LLC. Osiela G. Villarreal, individually and as representative of the Estate of Jose Rodriguez, deceased and as next friend of minor children Nayeli M. Rodriguez and Noemi M. Rodriguez, and Marisela Trevino Rodriguez (collectively referred to herein as "Villarreal") appeal the take nothing judgment rendered against them after a jury failed to find any negligence

by Troy Construction proximately caused the occurrence. Villarreal contends the trial court abused its discretion in admitting certain expert testimony and denying her motion for new trial. Villarreal also contends the evidence is factually insufficient to support the jury's failure to find Troy Construction negligent. We affirm the trial court's judgment.

## SUFFICIENCY

In her second issue, Villarreal asserts that the jury's finding that Troy Construction was not negligent is against the overwhelming weight of the evidence. Specifically, Villarreal contends the jury's finding disregards the evidence that Moore was speeding "at least 10 miles over the speed limit, was illegally operating an overwidth vehicle without a permit, and that the collision occurred in Mr. Rodriguez's eastbound lane of traffic after the Troy driver did exactly what he was taught not to do by improperly steering left." Troy Construction responds that the evidence referred to by Villarreal in her brief was hotly contested at trial, and Villarreal's own accident reconstructionist testified that he had no basis to criticize Troy Construction's employee.

Because Villarreal attacks the factual sufficiency of an adverse finding on which she had the burden of proof, Villarreal must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *In re Estate of McNutt*, 405 S.W.3d 194, 200 (Tex. App.—San Antonio 2013, no pet.). "[T]he trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *In re Estate of McNutt*, 405 S.W.3d at 200.

It is undisputed that Rodriguez entered the eastbound lane of a two-lane highway to pass a tractor trailer in the westbound lane on a hill in a no-passing zone. When Moore sufficiently

crested the hill and was able to see Rodriguez in his lane, both drivers had approximately seven seconds to react. Both accident reconstructionists testified that the accident would have been avoided if Rodriguez had reacted by returning to his own lane. Moore quickly reacted by braking and steering to the right toward the fog line of his lane. Rodriguez's reaction was delayed and, unfortunately, instead of returning to his lane, Rodriguez mirrored the movement of Moore's tractor trailer by steering to the left also toward the fog line of Moore's lane. Although contested, evidence was presented at trial that Rodriguez's delayed response could be attributed to impairment from marijuana use.

Although Villarreal contends in her brief that the impact between the two vehicles occurred in the eastbound lane, Villarreal's accident reconstructionist testified that the impact occurred when the vehicles were three-quarters in the westbound lane and one-quarter in the eastbound lane. Whether Moore steered the tractor trailer to the left also was disputed at trial. The accident reconstructionists and another witness presented as an expert in truck driving, Lew Grill, testified that Moore steered left just prior to the impact; however, Moore testified he did not steer left and instead was moved to the left as a result of the impact. With regard to Moore's speeding and the overwide load, Rodriguez's accident reconstructionist testified that he had no criticism of Moore's driving and the overwide load had no effect on the collision; however, Grill testified that Moore was negligent in speeding and driving with the overwide load. Evidence also was presented that the accident could have been avoided if Moore had not been speeding. Sergeant Joel Betancourt, the officer from the Texas Department of Public Safety who led the investigation of the accident, however, concluded that Rodriguez was responsible for the accident because he was passing in a no-passing zone on a hill before colliding with Moore's tractor trailer.

As previously noted, it is exclusively within the jury's province to assess the credibility of the witnesses and the weight to be given their testimony. *In re Estate of McNutt*, 405 S.W.3d at

200. The jury could have given the most weight to the testimony that the accident would have been avoided if Rodriguez had not decided to pass in a no-passing zone on a hill or if Rodriguez had returned to his lane of traffic upon seeing Moore's tractor trailer. Accordingly, the evidence is factually sufficient to support the jury's finding that no act of negligence by Troy Construction proximately caused the occurrence.

### EXPERT TESTIMONY

In her first issue, Villarreal contends the trial court erred in denying the motion to strike the opinions of J. Rod McCutcheon because his opinions were not reliable, and the drug testing results providing the only evidentiary basis for his opinions were improperly admitted because the toxicology report was not authenticated and was hearsay. Troy Construction responds that McCutcheon's opinions were reliable, and Villarreal's own expert toxicologist concluded that the evidence supported McCutcheon's opinions. Troy Construction further responds that the toxicology report was part of Rodriguez's autopsy and was a public record resulting from the Texas Department of Public Safety's investigation.

A trial court's decision to admit expert testimony is reviewed under an abuse of discretion standard. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *Id.*

For an expert's testimony to be admissible, the testimony must be based upon a reliable foundation. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010). To gauge reliability, the trial court must evaluate the methods, analysis, and principles relied upon by the expert in reaching his opinion and ensure that the expert's opinion: (1) comports with applicable professional standards outside the courtroom; and (2) has a reliable basis in the knowledge and experience of the discipline. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001)

(quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725-26 (Tex. 1998)).  To aid in its determination, the Texas Supreme Court has suggested several factors the trial court can consider, including: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique.  *TXI Transp. Co.*, 306 S.W.3d at 235 & n.2 (citing *Robinson*, 923 S.W.2d at 557).

1.      Toxicology Report

Villarreal first contends that the toxicology report establishing that Rodriguez had marijuana in his system was inadmissible because the report was not authenticated and was hearsay.  Officer Betancourt testified that the toxicology report was included in his official accident report.  Since Officer Betancourt had personal knowledge of the content of his report, this testimony sufficiently authenticated the toxicology report.  *See* TEX. R. EVID. 901(b)(1).  Moreover, because Officer Betancourt's report was a public record or report, it was excepted from exclusion by the hearsay rule under Rule 803(8).  *See* TEX. R. EVID. 803(8); *Tex. Dept. of Public Safety v. Caruana*, 363 S.W.3d 558, 564 (Tex. 2012).  Therefore, the trial court did not abuse its discretion in admitting the toxicology report.

2.      McCutcheon's Opinions

McCutcheon is a forensic toxicologist with forty years of experience in analyzing postmortem blood samples to determine the presence of drugs and alcohol in the blood.  As previously noted, the toxicology report showed Rodriguez's blood contained Delta-9 THC, the active ingredient in marijuana.  McCutcheon provided two opinions based on these test results.  First, McCutcheon opined that Rodriguez's driving was impaired based on the level of THC in his

blood. Second, McCutcheon opined that Rodriguez last used marijuana two hours prior to the accident. Each opinion must separately be examined to determine if the trial court abused its discretion in determining the opinions were reliable and admissible.

Villarreal contends the trial court abused its discretion in admitting McCutcheon's opinion regarding the time Rodriguez last used marijuana because McCutcheon relied on an extrapolation model that was developed by Dr. Marilyn Huestis and had only been determined to be valid for blood samples drawn from living people. Because blood undergoes postmortem redistribution after a person dies, which changes the drug concentration in the blood, Villarreal contends the model could not be used to extrapolate Rodriguez's time of last use based on his postmortem blood samples. Although Villarreal also appears to challenge McCutcheon's opinion that Rodriguez was impaired based simply on the level of THC shown in his blood by the test result, Villarreal's challenge to this opinion is far less detailed and specific.

Similarly, Troy Construction primarily responds to Villarreal's challenge to McCutcheon's opinion regarding the time of Rodriguez's last use. Troy Construction states that although Dr. Huestis's model was initially not applied to postmortem blood samples, subsequent research had shown that postmortem redistribution for THC is low to moderate. Based on this additional research, McCutcheon opined Dr. Huestis's model could reliably be applied to postmortem blood samples.

a.     Time of Last Use

No one disputes that Dr. Huestis's model is reliable. The evidence established that her model had been tested, published, and was generally accepted in the scientific community. Although the model was not recommended for application to postmortem blood samples when initially published, McCutcheon explained that subsequent research Dr. Huestis published in 2011 showed that the model could be used to determine the time of last use of marijuana from a

postmortem blood sample because the postmortem redistribution of THC was low to moderate. Although Dr. Huestis still did not recommend the use of the model in postmortem analysis, McCutcheon stated that Dr. Huestis, as a researcher, would require more definitive analysis before applying her model to postmortem blood samples. Given his experience as a toxicologist, McCutcheon testified that the research regarding the moderate postmortem redistribution of THC established the model's reliability for this use. With regard to the articles Villarreal relied upon to discredit the application of the model to postmortem blood samples, McCutcheon explained that the articles pre-dated Dr. Huestis's 2011 research regarding the moderate postmortem redistribution of THC, which was the primary concern for not applying the model in the postmortem context. Moreover, several of the articles are simply general statements regarding the effect of postmortem redistribution without any specific application to marijuana or THC. Finally, Dr. Huestis's 2011 research reported on three cases in which samples of the decedent's blood was available both prior to the death and postmortem. McCutcheon explained that those cases showed that the THC level was higher in the test results from the blood taken before the person's death than in the test results from the postmortem blood sample.

Although McCutcheon's rationale for applying Dr. Huestis's model to postmortem blood samples based on Dr. Huestis's 2011 research appears reasonable, a careful examination of the *Robinson* factors reveals that McCutcheon's opinion as to time of last use is unreliable. First, the application of the model to postmortem blood samples clearly can be tested. In fact, Dr. Huestis's 2011 research was focused on testing that application; however, Dr. Huestis concluded in her 2011 report that insufficient testing had been undertaken to validate the application of the model to postmortem blood samples. Second, research concluding that Dr. Huestis's models can validly be applied to postmortem blood samples had "not been published in any scientific journal, treatise, or publication so [the theory] could be subjected to peer review by someone other than

[McCutcheon, the] expert retained by [Troy Construction] in regard to the lawsuit." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 643 (Tex. 2009). "The purpose of publication and peer review is to allow the relevant community to comment on the expert's theories, findings, and conclusions." *Id*. "That did not occur here." *Id*. "Further, [McCutcheon] did not indicate that this theory had been accepted as valid by any part of a relevant scientific or expert community at large." *Id*. Accordingly, we hold the trial court abused its discretion in admitting McCutcheon's testimony regarding the time Rodriguez last used marijuana.

> b.      Impairment Based on Test Results

McCutcheon's second opinion is that Rodriguez was impaired at the time he was driving based on the postmortem test results establishing that the THC level in his blood was 3.6 nanograms per milliliter (ng/ml). In support of his opinion, McCutcheon relied on a published, peer-reviewed scientific article reporting that 75-90% of study participants were impaired with serum concentrations of THC between 5 and 10 ng/ml. Dr. Huestis reported a similar conclusion after research she conducted in 2013. McCutcheon explained that "whole blood concentration is approximately half of what the plasma concentration would be if you measured it at the same time;" therefore, McCutcheon opined that 75-90% of drivers would be impaired with whole blood THC concentrations between 2.5 and 5 ng/ml. Given Rodriguez's THC concentration of 3.6 ng/ml, McCutcheon opined that Rodriguez was impaired at the time he was driving.

In reaching his opinion, McCutcheon acknowledged that he had to take into account that the blood sample was a cardiac blood sample, as opposed to a femoral sample, and could cause a higher test result. McCutcheon also acknowledged that he had to take into account the effect of postmortem redistribution; however, McCutcheon explained he was less concerned about postmortem redistribution in view of Dr. Huestis's 2011 research showing the postmortem redistribution effect for THC was moderate. McCutcheon further acknowledged scientific articles

expressing the danger of relying on postmortem results because of redistribution; however, he responded that those articles were written prior to Dr. Huestis's 2011 research and several articles were not specific as to marijuana and THC.

With regard to this second opinion, the theory that certain levels of THC cause impairment had been tested, published and was accepted in the scientific community. Moreover, McCutcheon took into consideration factors that could affect the application of the theory, including the testing of cardiac blood and the postmortem redistribution effect which was shown through Dr. Huestis's 2011 testing to be moderate. Therefore, we conclude the trial court did not abuse its discretion in admitting McCutcheon's opinion that Rodriguez was impaired at the time he was driving. Although Villarreal's expert disagreed with McCutcheon's opinion, this disagreement did not render McCutcheon's opinion unreliable. Moreover, Villarreal's argument that Rodriguez could have been in the 10-25% of drivers who were not impaired goes to the weight the jury might give to the evidence, not to its admissibility.

3.     Harm Analysis

Having held that only one of McCutcheon's two opinions should have been admitted into evidence, we must determine if the trial court's admission of McCutcheon's opinion regarding the time Rodriguez last used marijuana requires reversal. Error by the trial court requires reversal only if the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a).

Villarreal argues the admissibility of McCutcheon's opinions was harmful because Rodriguez's use of marijuana was emphasized during closing argument and went toward the crucial, contested fact of Rodriguez's delayed reaction time. This argument, however, is based on the assumption that both of McCutcheon's opinions were inadmissible. As we have concluded, however, the trial court properly allowed McCutcheon to testify that Rodriguez was impaired at the time he was driving. Thus, the jury could have taken Rodriguez's marijuana use into

consideration when determining negligence, regardless of the time at which Rodriguez last used the marijuana. Moreover, as previously noted, the jury could have given the most weight to the evidence establishing that the accident would not have occurred if Rodriguez had not decided to pass in a no-passing zone on a hill, regardless of whether Rodriguez was impaired by the use of marijuana. Accordingly, we hold that the trial court's error in allowing McCutcheon to testify regarding the time Rodriguez last used marijuana did not likely cause the rendition of an improper judgment and, therefore, does not require reversal.

### MOTION FOR NEW TRIAL

In her final issue, Villarreal asserts the trial court erred in denying her motion for new trial because the trial was fundamentally unfair. Specifically, Villarreal contends the trial court allowed Troy Construction to present McCutcheon as its final witness despite granting Villarreal's motion in limine which required the parties to approach the bench before presenting any evidence regarding Rodriguez's marijuana use during trial. Based on the trial court's ruling on the motion in limine, Villarreal contends that she conducted no voir dire on the issue of marijuana use and closed her case-in-chief without ever mentioning marijuana. Villarreal concludes that the trial court's "last minute reversal" of "its previous decision on the motion in limine" was unfair and prejudicial. Troy Construction responds that Villarreal's reliance on the motion in limine ruling was misplaced, noting the trial court clarified the effect of its ruling when it granted the motion.

"Denial of a motion for new trial is reviewed for abuse of discretion." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). The granting of a motion in limine is not a ruling on the admissibility of the evidence. *Pojar v. Citre*, 199 S.W.3d 317, 339 (Tex. App.—Corpus Christi 2006, pet. denied); *Ulogo v. Villanueva*, 177 S.W.3d 496, 500 (Tex. App.—Houston [1st Dist.] 2005, no pet.). A motion in limine simply prohibits references to specific issues without

first obtaining a ruling on the admissibility of those issues outside the presence of the jury. *Ulogo*, 177 S.W.3d at 500.

After a pre-trial hearing, the trial court ruled that McCutcheon's testimony was admissible. In granting the motion in limine, the trial court did not alter its ruling with regard to McCutcheon's testimony, and even expressly recognized the effect of its ruling, stating "I would ask that we take it up outside the presence of the jury if counsel wants to get into the issue regarding marijuana." Villarreal's contention that the trial court "reversed" its ruling on the motion in limine misstates the law. The trial court never altered its decision from when it initially pronounced that McCutcheon would be permitted to testify regarding Rodriguez's marijuana use, and the trial court's refusal to alter its decision was neither unfair nor prejudicial. As a result, the trial court did not abuse its discretion in denying Villarreal's motion for new trial.

## CONCLUSION

The trial court's judgment is affirmed.

Rebeca C. Martinez, Justice