**Reverse in part, render in part, vacate in part, and affirm in part; Opinion Filed July 31, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01277-CV

**PARKING COMPANY OF AMERICA VALET, INC. AND PARKING COMPANY OF AMERICA LOVE FIELD, INC., Appellants**
**V.**
**BRADLEY RYAN FELLMAN, Appellee**

**On Appeal from the County Court at Law No. 3**
**Dallas County, Texas**
**Trial Court Cause No. CC-16-01273-C**

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Myers

Parking Company of America Valet, Inc. and Parking Company of America Love Field, Inc. appeal the trial court's judgment in favor of Bradley Ryan Fellman on his suit for damages. Fellman sued appellants after their employee, a valet parking attendant, crashed Fellman's car. Fellman sued appellants for breach of the bailment contract and for violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA). *See* TEX. BUS. & COM. CODE ANN. §§ 17.41–.63. Appellants bring three issues on appeal contending the trial court erred by (1) denying appellants' motion to strike Fellman's expert witness who testified to the diminution in value of the car as a result of the accident; (2) granting Fellman's motion for summary judgment on his claim for breach of contract; and (3) rendering judgment for Fellman on his claim under the

DTPA. We reverse the trial court's judgment in part and vacate the award of treble damages under the DTPA, vacate the trial court's award of attorney's fees and prejudgment interest, otherwise affirm the judgment, and remand the case to the trial court to determine the amount of attorney's fees and prejudgment interest.

## BACKGROUND

Appellants operate a valet parking service at Love Field Airport in Dallas. Fellman, an attorney, owned a limited-edition 2004 MX-5 Mazdaspeed Miata. Fellman had made over $11,000 worth of upgrades to the car.

On August 24, 2015, Fellman drove his car to Love Field Airport and left it with appellants to be valet parked. At that time, the car was undamaged. The parking attendant gave Fellman the customer's portion of a claim ticket. The lot for valet-parked cars was next to the location where drivers leave the cars with the parking attendants. The parking attendant, Adrian Miranda, did not drive the car directly to the lot but instead went on a joyride, driving Fellman's car around the airport. While doing so, Miranda collided with a concrete pillar, damaging the front and right front corner of the car. Miranda filled in the retained portion of the claim ticket to show, falsely, that the damage he caused was present when Fellman left the car to be valet parked.

When Fellman returned to pick up his car, he was told his car was damaged. Fellman spoke to the manager, Kevin Fanning, and explained that the car was not damaged when he left it with appellants. Fanning did not believe Fellman, and Fanning showed Fellman the claim ticket showing the car was damaged when Fellman left the car with appellants. Fanning accused Fellman of making a fraudulent claim. Fellman asked Fanning to check the security video to see if it showed what happened.

When Fanning viewed the security video, he saw the car was undamaged when Fellman left it with Miranda and that Miranda drove it beyond the area appellants used for parking cars.

–2–

Fanning called Fellman and told him the accident was appellants' fault and that appellants would pay all expenses including the towing fee, cost of repairs, and car-rental charges.

In October 2015, the repairs to Fellman's car were completed. Fellman sent Fanning an e-mail with the information about paying for the repairs, but appellants did not pay them. Fellman's auto insurer paid the repair shop for the cost of the repairs minus the amount of the deductible, and Fellman paid the repair shop the amount of his insurance deductible. In late October 2015, Fellman sent appellants a demand letter for payment of the damages, insisting appellants pay $9,233.79 to Fellman's insurer for the towing fee, the repairs, and the rental-car charges paid by the insurer. Fellman also demanded payment to him of $4,422.85 for his uninsured expenses consisting of his insurance deductible of $422.85, $3,000 for 10 hours of his time spent dealing with the repairs, and $1,000 for diminution in value to the car as a result of the accident. Fanning told Fellman that appellants would pay for the diminution in value if Fellman got a written appraisal. Fanning told Fellman that appellants would not pay Fellman for his time. The next month, Fellman sent Fanning a written appraisal setting forth the diminution in value to the car as a result of the accident. Appellants did not pay Fellman or his insurer.

In March 2016, Fellman filed suit against appellants, alleging they breached a contract for bailment of Fellman's car and that they violated the DTPA. The next month, appellants paid Fellman's insurer $9,233.79 for the towing fee, cost of the insured repairs, and the rental-car charges. Appellants did not pay Fellman for his insurance deductible, the diminished value of the car, or his lost time. Fellman moved for summary judgment on his claim for breach of contract, which the trial court granted, awarding Fellman "$2,975 for the diminution in value to Plaintiff's car."

The parties tried Fellman's claim for violations of the DTPA to the trial court. The court concluded that appellants violated the DTPA and that Fellman's damages under the DTPA were

–3–

$13,906.64.[1] The court also awarded Fellman additional damages under the DTPA of $25,813.28. *See* BUS. & COM. § 17.50(b)(1). The court offset the award of damages by the $9,233.79 appellants had paid Fellman's insurer. The court also awarded Fellman prejudgment interest of $2,263.49 and attorneys' fees of $137,000 through trial as well as additional fees for appeal.

## EXPERT WITNESS ON DIMINISHMENT OF VALUE

In their first issue, appellants contend the trial court erred by denying appellants' motion to exclude the testimony of Monica Fisher, Fellman's expert witness on the car's inherent diminution in value. Appellants argue Fisher's testimony and expert report should have been excluded because (1) she signed reports and affidavits that reached different conclusions concerning the diminution in value; (2) for comparable values, Fisher used advertised prices for cars at dealerships instead of the prices at which the cars actually sold; (3) Fellman sold the car before trial, and the sales price of the car established its true market value; (4) Fisher failed to account for hail damage to the car; and (5) Fisher's use of Carfax reports was inconsistent.

We review a trial court's rulings on objections to summary judgment evidence, including whether expert testimony is reliable, for an abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). "An expert witness may testify regarding 'scientific, technical, or other specialized' matters if the expert is qualified and if the expert's opinion is relevant and based on a reliable foundation." *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 215 (Tex. 2010) (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2009); TEX. R. EVID. 702). "Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable." *Whirlpool*, 298 S.W.3d at 637. "When the expert's underlying scientific technique or principle is unreliable, the expert's

---

[1] Fellman's damages consisted of $6,072.33 for repairs to the car, $3,001.46 for rental-car charges, $160 for towing, $2,975 for the car's diminished value, $275 for the cost of the diminished-value appraisal, $422.85 for Fellman's insurance deductible, and $1,000 for Fellman's lost time.

–4–

opinion is no more than subjective belief or unsupported speculation and is inadmissible." *Wiggs v. All Saints Health Sys.*, 124 S.W.3d 407, 410 (Tex. App.—Fort Worth 2003, pet. denied). "[A] party may assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict." *Moreno v. Ingram*, 454 S.W.3d 186, 189 (Tex. App.—Dallas 2014, no pet.).

### Different Conclusions in the Two Reports

Appellants assert that because Fisher issued two reports that reached different conclusions concerning the car's diminution in value due to the accident, her testimony is unreliable. We disagree.

In the November 6, 2015 original report, Fisher stated the car was worth $9,374 before the accident and $6,562 after being repaired resulting in a diminution in value of $2,812. In the February 28, 2017 amended report, Fisher stated the car was worth $14,875 before the accident and $11,900 after being repaired resulting in a diminution in value of $2,975. Fisher explained the difference between the two reports. In the first report, she did not include the value added to the car by Fellman's upgrades before the accident costing $11,003.25, including an upgraded turbo system, radiator, clutch, and exhaust system. The first report also did not include the diminution in value from hail damage in 2011.

In her first report and affidavit, Fisher stated the car's value as of the date of the accident was $9,374. She determined the diminution in value due to the history of repairs to the car was thirty percent, $2,812. This appraisal did not include the increase in value due to the upgrades Fellman had made to the car, and the appraisal did not include the decrease in value due to the 2011 hail damage. Fisher testified in her second affidavit that she issued the second report "to account for the May 2011 hail damage and consideration of the more than $11,000 worth of performance parts and upgrades he installed." In the second report, Fisher increased the car's

value by fifty percent of the cost of the upgrades of the car, $5,501, which made the car's value without damage on the day of the accident $14,874. Fisher stated the total diminishment in value from all damage repairs was thirty percent. She stated that the hail damage reduced the car's value by ten percent. That left twenty percent of the value diminishment due to the accident in this case. Twenty percent of $14,874, rounded off, is $2,975.

Appellants argue that Fisher's testimony that the upgrades were not included in the first report "is simply not true." They point to the fact that Fellman sent Fisher invoices for the upgrades before she prepared the first report. However, regardless of whether Fellman sent the invoices and whether Fisher received them, nothing in the record shows they were included in the first report.

Appellants also argue, "Even if one accepts Fisher's 'conservative' assertion that the upgrades were worth 50% of their installation cost on the date of pre-loss valuation, the value of the Vehicle should have only increased by approximately $2,800, *not* $5,500." The upgrades cost $11,023.25; fifty percent of that amount, rounded off, is $5,501. Appellants do not explain why Fisher's valuation of the upgrades was unreliable.

Appellants also argue that Fisher's reports with the two different sets of values and Fisher's affidavits with those numbers, each swearing it was true and correct, irreparably damaged her credibility and made her conclusions unreliable. Appellants cite no authority for this position. Appellants do not explain why the second report combined with Fisher's second affidavit explaining the need to change the valuations in the first report is unreliable.

Appellants also argue Fisher's testimony was unreliable because she did not personally inspect the car. Fisher resides in Oregon, and the car was in Texas. Fellman sent Fisher pictures of the car and, they discussed the condition of the car. She testified that the pictures and the discussion allowed her to determine the value of the car without personally inspecting it. Fisher's

appraisal included a description of the car's condition. Appellants do not assert that this description was inaccurate.

We conclude appellants have failed to show Fisher's testimony was unreliable because she issued two reports with different valuations.

**Using Advertised Listing Price Instead of Actual Sale Price for Comparable Value**

Appellants argue Fisher's report is unreliable because her reports used as comparable values the advertised prices for similar cars at car dealerships. Fisher did not use the sales prices for those cars, and she testified she did not know at what prices the cars sold. Fisher testified that she used the advertised prices from car dealerships listed on websites like Cars.com and Autotrader. She testified that the auto dealers' listed prices on those websites were the most available and reliable.

"Market value is defined as the price property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it." *Exxon Corp. v. Middleton*, 613 S.W.3d 240, 246 (Tex. 1981). "Market value may be calculated by using comparable sales." *Id.*

Appellants cite numerous cases involving real property or natural gas where courts have stated that a seller's asking price or a buyer's offering price does not prove the market value of real property or natural gas. *See Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 831 (Tex. 2014) (diminished value of real property due to pollution); *Exxon*, 613 S.W.2d at 246–47 (comparable sales of natural gas); *Hanks v. Gulf, C. & S. Ry. Co.*, 320 S.W.2d 333, 336 (Tex. 1959) ("an unaccepted offer to purchase is not competent evidence upon the issue of market value of the land"); *Lee v. Lee*, 47 S.W.3d 767, 785 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("Texas courts have long held that unaccepted offers to purchase property are no evidence of market value of property."). This case does not involve natural gas, real estate, or

other market where the sales price of comparable property is readily determinable. Instead, this case involves the market value of a used car. Appellants do not explain, and no evidence shows, there is any resource showing the sales prices of used cars. Fisher testified she used the prices dealers advertised on certain websites because they were the "truly factual number."

The record also shows Fisher did not rely solely on the advertised prices of the comparable cars to determine the value of Fellman's car. She testified she also considered the make and model of the car, the mileage and condition of the car, the upgrades, and the type and extent of damage the car suffered.

Appellants also criticize Fellman's appraisal for not limiting the comparable cars to the county where the damage occurred, Dallas County. Fisher testified she tries to use comparable cars as close to the owner as possible, but when a car is rare, the search for comparable cars may require searching farther. Fisher's reports used comparable cars located in Alabama and Connecticut. Appellants presented no evidence of a closer car that could have been used as a comparable car. Considering the rarity of the Fellman's limited-edition 2004 Mazdaspeed Miata, the fact that Fisher looked outside Dallas County for comparable vehicles does not make her appraisal unreliable.

### Sales Price of Fellman's Car

Before trial, and about a year after the accident, Fellman sold the car to a buyer in Georgia for $8,500. Appellants contend that figure should constitute the post-accident market value for determining diminished value. Fisher testified that the post-accident sale price of a car is irrelevant to determining its "inherent diminished value," which is what her appraisal determined.

Fisher stated in her report and testified in her deposition that inherent diminished value is the loss in value of an automobile following a collision and repair of the damage. This diminishment in value is due to the stigma buyers attach to cars that have been in accidents. Fisher

–8–

testified, "[T]he diminished value is at the time of the loss. It doesn't matter what you sell the vehicle for." She testified this stigma also affects rare cars because structural damage makes the car less collectible.

Appellants also argue the value of a car can only go down, so its post-accident value should be greater than the $8,500 the car sold for a year after the accident. However, the car was not in the same condition when it was sold as it was before the accident; the evidence showed it was in better condition. Between the accident and the sale, Fellman spent about $1,000 upgrading the car's brakes, and he put new tires on the car shortly before he sold it.

Appellants have not shown Fisher's report was unreliable because it did not use the sales price of the car.

## Hail Damage

Appellants also argue that Fisher failed to account for the hail damage to the car. Fisher's report did account for the hail damage—she determined it reduced the car's value by ten percent. Appellants argue the diminution in value from the hail damage should have been twenty percent, the same as the collision damage. On appeal, appellants assert Fisher picked ten percent at random. Nothing in the record shows she picked ten percent at random. Fisher explained in her deposition, "Hail damage relative to a collision, in general, brings less—lot less stigma." This statement explains the difference in diminution in value of ten percent for hail damage and twenty percent for collision damage.

## Carfax Reports

Appellants also argue Fisher's testimony was unreliable because of conflicting information about Fisher's use of Carfax reports:[2] "[A]lthough Fisher alleges that she does not believe a

---

[2] As the Amarillo Court of Appeals explained, "CARFAX is a nationwide reporting system whereby a purchaser can review the ownership and operational history of a vehicle." *Webb v. Upshaw*, No. 07-15-00401-CV, 2016 WL 2990512, at *1 n.3 (Tex. App.—Amarillo May 20, 2016, no pet.).

vehicle's Carfax to be reliable, [Fisher's] Reports reference Carfax reports more than once, and communications from Fisher to Plaintiff prior to her deposition include her request to see the Vehicle's Carfax."

In the section of her report discussing disclosure of damage, Fisher stated, "[M]any times consumers and dealers will run a CarFax and/or Wreck Check to verify a clean damage report." In the section of the report discussing "the factors potential buyers may consider important if they know the vehicle has been in such an accident," Fisher stated, "The vehicles with such autobody damage, or which have been in an accident, are 'branded' as having the potential for problems, and though not reflected on the 'title' to the vehicle, are commonly reported by such private enterprises as 'CarFax' and Wreck-Check." Before her deposition, Fisher asked Fellman to provide her with a copy of the Carfax report. Fisher explained during her deposition that she asked Fellman to send her a copy of the Carfax report so she could respond to any questions that might be raised about it during her deposition. She also stated that she does not use Carfax reports in her appraisals because they are unreliable. She stated Carfax reports often omit damage or repairs that occurred or they list damage or repairs that did not occur.

Fisher's statements about Carfax reports are not inconsistent. Fisher's reports state that potential buyers use a Carfax report to learn if a car has been damaged in an accident because Carfax reports may list the damage. In her deposition, she stated she does not use Carfax reports because they can be unreliable, but she asked Fellman to provide her with a copy of the Carfax report in case she was asked about it during her deposition. None of these statements indicate that her testimony concerning diminution of value was unreliable.

We conclude appellants have not shown the trial court abused its discretion by denying appellants' motion to exclude Fisher's testimony. We overrule appellants' first issue.

## SUMMARY JUDGMENT

In their second issue, appellants contend the trial court erred by granting Fellman's motion for summary judgment. The standard for reviewing a traditional summary judgment is well established. *See McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

Appellants argue summary judgment was improper because Fisher's testimony and reports raised genuine issues of material fact. Appellants assert that because Fisher's first and second reports and affidavits came to different conclusions concerning the car's diminution in value due to the accident, summary judgment was improper. We disagree.

Fisher explained that her analysis in the first report and affidavit failed to consider the effect of the hail damage and equipment upgrades to her determination of the car's diminution in value. Her second report corrected those omissions. Appellants do not cite any case holding that an amendment to an expert's report to add omitted data that changes the report's conclusion raises a genuine issue of material fact.

Appellants cite *Kirkwood v. PrimaCare, Inc.*, No. 05-97-01934-CV, 2000 WL 124675 (Tex. App.—Dallas Feb. 3, 2000, no pet.) (not designated for publication). In that case, the issue was whether the physician who treated the plaintiff at PrimaCare was PrimaCare's employee.

–11–

During his deposition, the physician stated he was an "ex-employee" of PrimaCare and that he "worked for PrimaCare Medical Centers. The physician later signed an affidavit stating he "was not an employee of PrimaCare, Inc.," his agreement "was with Affiliated Primary Care Physicians, P.A.," and that he "did work at PrimaCare-provided facilities, but not for PrimaCare." We concluded that conflicting inferences about the physician's employment could be drawn from his deposition and affidavit, and a fact issue existed whether he was an employee of PrimaCare when the patient was treated. *Id.* at *4. Fisher's reports, affidavits, and deposition show no such direct contradictions. Instead, they show the results in her first report were based on incomplete data and that the second report used the complete data in the calculations of diminution of value.

Appellants also cite *Randall v. Dallas Power & Light*, 752 S.W.2d 4 (Tex. 1988) (per curiam). In that case, Randall was in an accident caused by Dallas Power & Light's (DPL's) truck. DPL's claims agent met with Randall, and DPL paid Randall some money. Randall later sued DPL, and DPL moved for summary judgment on the basis of accord and satisfaction. Randall testified in his affidavit that the claims agent offered to compensate him for his losses to that point and that "DPL would take care of any future problems." *Id.* at 5. Randall later testified in his deposition "that he could not remember any representations being made by the claims agent regarding future damages or expenses." *Id.* The trial court granted DPL's motion for summary judgment. The supreme court reversed, concluding that conflicting inferences could be drawn from the affidavit and deposition, and DPL did not meet its burden of showing there was no genuine issue of material fact. *Id.* In this case, however, Fellman's later testimony and reports established that her earlier report and affidavit were based on incomplete data, which she corrected in her amended report. This case does not involve a contradiction such as that present in *Randall*.

Appellants also cite *Westchester Enterprises, L.P. v. Grand Homes, Inc.*, No. 05-98-01829-CV, 2001 WL 953237 (Tex. App.—Dallas Aug. 23, 2001, pet. denied) (not designated for

–12–

publication). The issues in that case included whether a geotechnical engineer working on a residential-housing development "had a duty to raise the dangers of erosion with the Developer." *Id.* at *4. The engineer moved for summary judgment asserting he had no such duty. The nonmovants presented evidence of an article written by the engineer that "directly contradict[ed] [the engineer's] affidavit and [his company's] position in its motion for summary judgment and its brief on appeal." *Id.* at *6. We concluded the engineer did not conclusively establish he had no duty to recognize the erosion danger. *Id.* This case, however, does not involve directly contradictory statements. Instead, Fisher's first report was based on incomplete date, and the second report uses the complete data to reach the conclusions regarding diminution of value.

The fact that Fisher's first and second reports had different conclusions regarding the diminution of value from the crash does not raise a fact question. Fisher explained that the first report did not include the data concerning the upgrades and the hail damage and that the second report corrected that omission. Appellants provide no authority holding that a fact issue is created barring summary judgment when a movant's expert report omits facts that are corrected in an amended report.

Appellants also argue that the sale price of the car when Fellman sold it after the accident was evidence raising a fact question concerning diminution of value. Appellants cite no authority in support of this position. Fisher testified that inherent diminution in value is the stigma a potential buyer attaches to a car that has been in a collision and that the actual price the car sells for is not relevant. Also, the car was not in the same or reduced condition from the time of the collision. The evidence showed the car, even though it had more miles and was a year older, had new tires and about one thousand dollars' worth of upgraded brakes. Therefore, the car's sales price did not raise a genuine issue of material fact.

We conclude appellants have not shown the trial court erred by granting Fellman's motion for summary judgment. We overrule appellants' second issue.

## DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT

In their third issue, appellants contend the trial court erred by finding appellants violated the DTPA. The DTPA's purposes are "to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." BUS. & COM. § 17.44(a). We liberally construe and apply the Act to promote these purposes. *Id.*

A consumer may bring suit for the defendant's use of a false, misleading, or deceptive act or practice under section 17.46 that the consumer relies on to the consumer's detriment. *Id.* § 17.50(a)(1). A consumer may also bring suit for "any unconscionable action or course of action." *Id.* § 17.50(a)(3). A prevailing consumer may recover economic damages. If the trier of fact finds the defendant acted knowingly, the consumer may also recover mental anguish damages and up to three times the amount of the economic damages. If the trier of fact finds the defendant acted intentionally, the defendant may recover mental anguish damages and up to three times the amount of both the mental anguish and economic damages. *Id.* A prevailing consumer must be awarded court costs and reasonable and necessary attorneys' fees. *Id.* § 17.50(d).

In this case, Fellman alleged appellants violated section 17.46(b)(2), (7), and (24), which state:

> [T]he term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts: . . .
>
> (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . .
>
> (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . .
>
> (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was

intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed . . . .

Fellman also alleged appellants' actions were unconscionable and that appellants acted knowingly or intentionally.

The trial court found appellants made the following implied representations:

a. They [appellants] would park his car in the valet parking lot and not take his car outside of the valet parking lot including on unauthorized joyrides;

b. They would take reasonable care of the car; and

c. They would not use the portion of the blue ticket stub that has a "DAMAGE NOTED ON ENTRANCE" diagram (which is never shown to, or reviewed with, customers when they drop off their cars) as a deceptive ploy to accuse Plaintiff of making a fraudulent claim.

The trial court found appellants "engaged in a false, misleading, and/or deceptive act or practice by breaching these implied representations with respect to Plaintiff's car," that Fellman "relied on" appellants' representations to his detriment, and that appellants' breach of these implied representations was a producing cause of all of Fellman's damages. These findings indicate the trial court determined appellants violated section 17.46(b)(7). The trial court also found that Miranda's joyride was "an unconscionable action that violated the DTPA, and producing cause of all of the damages." The trial court also found Miranda's joyride was an "intentional or knowingly deceptive and unconscionable action," and the court awarded Fellman three times the amount of his economic damages.

Findings of fact in an appeal from a nonjury trial carry the same weight as a jury verdict and are reviewed under the same standards that are applied in reviewing evidence to support a jury's verdict. *Shaw v. County of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). In evaluating the legal sufficiency of the evidence to support a finding, we view the evidence in the light favorable to the fact finder's finding, indulging every reasonable inference supporting it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We "must credit

–15–

favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. The ultimate test is whether the evidence allows reasonable and fair-minded people to reach the finding under review. *See id.* Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 48 (Tex. 1998). In a factual sufficiency review, we view all the evidence in a neutral light and set aside the finding only if the finding is so contrary to the overwhelming weight of the evidence such that the finding is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Morris v. Wells Fargo Bank, N.A.,* 334 S.W.3d 838, 842 (Tex. App.—Dallas 2011, no pet.).

### Implied Representations

Appellants argue that there were no representations under section 17.46(b)(7). Appellants assert their nonverbal conduct could not constitute a representation under section 17.46(b)(7). Appellants cite two cases, *Red Roof Inns, Inc. v. Jolly*, No. 14-10-00344-CV, 2011 WL 6288147 (Tex. App.—Houston [14th Dist.] Dec. 15, 2011, no pet.), and *Alaniz v. Sirius Int'l Ins. Corp.*, No. 7:14-CV-215, 2014 WL 6982338 (S.D. Tex. Dec. 9, 2014), *aff'd*, 626 F. App'x 73 (5th Cir. 2015).

The portion of *Red Roof Inns* appellants (and Fellman) cite discussing section 17.46(b)(7) is not part of the majority opinion because the other two panel members declined to join that part of the opinion. *See Red Roof Inns*, 2011 WL 6288147, at *9 (Jamison, J. concurring), *12 (McCally, J., dissenting). However, as the court stated, "[a]ll of the justices on this panel agree that an actionable representation under the DTPA may be implied solely based upon conduct." *Id.* at *3.

In *Alaniz*, the federal district court stated, "However, Plaintiff admitted that he never had any contact with Defendant at all, for any reason. Therefore, since Defendant did not have *any* written or oral communications with Plaintiff, it is factually impossible that Defendant

–16–

made *false* representations." *Alaniz*, 2014 WL 2982338, at *4 (footnote omitted). Nothing in the opinion indicates the court considered the possibility that a representation could be implied. The opinion does not state that a representation cannot be implied.

This Court has held that implied representations may be actionable under the DTPA. *See Chambless v. Barry Robinson Farm Supply, Inc.*, 667 S.W.2d 598, 602 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) ("We hold that, absent any representations (oral or written) to the contrary, by *displaying* the tractor with the clevis on it, Robinson *represented* that the clevis would be included in the sale of the tractor."). We are bound by our prior holdings. *See Chakrabarty v. Ganguly*, 573 S.W.3d 413, 415 (Tex. App.—Dallas 2019, no pet.) (en banc). To the extent appellants argue implied representations are not actionable under the DTPA, we reject that argument.

Appellants assert they made no implied representations under the DTPA and that no evidence supports the trial court's finding of implied representations.. We review the record to determine the sufficiency of the evidence to support the trial court's finding that appellants made the implied representations.[3]

Fanning testified:

Q. It's implied there that the valet's job is to take good care of the car while the customer is away from the car, right?

---

[3] In *Red Roof Inns*, Justice Frost proposed a test for determination of an implied representation under section 17.46(b)(7):

[T]his court should not imply a representation based upon a party's conduct unless that representation was clearly contemplated by the party charged with making it. A representation should be implied from conduct only when, under the circumstances at the time the party engaged in that conduct, the only reasonable interpretation of that conduct is that the party meant to convey the representation in question.

. . . .

To qualify as an implied representation, the representation must be so obvious that it did not need to be stated. More importantly, there must be one and only one thing that the implied representation reasonably could mean. The law will not imply a representation when a party is said to have represented one thing by its conduct and the same action or conduct reasonably could be construed to have a different meaning.

*Red Roof Inns*, 2011 WL 6288147 at *4, *5. Although Justice Frost (now Chief Justice Frost) was the author of the majority opinion, the other two Justices did not join that section of her opinion.

A. Again, that is correct.

Q. And that doesn't include driving it in any unauthorized fashion, does it, sir?

A. Right.

. . . .

Q. . . . If Mr. Fellman's expectation is that his car is only going to be driven as absolutely necessary to preserve and protect it and park it safely, that's his expectation. That's also the expectation of your company, right?

A. Correct.

This testimony supports the trial court's findings that appellants impliedly represented they "would park his car in the valet parking lot and not take his car outside of the valet parking lot including on unauthorized joyrides;" and that they "would take reasonable care of the car." Appellants do not challenge the trial court's finding that the breach of these implied representations was a producing cause of all of Fellman's damages. These findings supported the trial court's rendition of judgment for Fellman under the DTPA.[4]

**Treble Damages**

Appellants also contend the trial court erred by awarding treble damages to Fellman.

Section 17.50(b) provides that a prevailing consumer may recover up to three times the amount of economic damages "[i]f the trier of fact finds that the conduct of the defendant was committed knowingly" or intentionally. The trial court's findings of fact and conclusions of law state, "Because Miranda's decision to take Plaintiff's car on a joyride, outside the valet service area, was an intentional and knowingly deceptive act and unconscionable action that violated DTPA § 17.50(a)(3) and (b)(1), Plaintiff is awarded an additional $25,813.28 (double the actual

---

[4] Appellants also argued there was no evidence to support the trial court's finding that appellants violated their representation that they would not use the part of the claim ticket retained by appellants to accuse Fellman of making a fraudulent claim. They argue there could not be an implied representation concerning the part of the claim ticket not given to Fellman because Fellman was unaware of the existence of that part of the claim ticket. Because we have determined the evidence supports the trial court's findings of other actions violating the DTPA, we need not address this argument.

economic damages).” The trial court also found that Miranda was in the course and scope of his employment with appellants “at all relevant times.”

The trial court’s award of treble damages was based on Miranda’s conduct of taking the car on a joyride. Appellants assert they are not vicariously liable for Miranda’s violation of the DTPA. We interpret their argument as asserting no evidence supports the trial court’s finding that Miranda was acting in the course and scope of his employment when he crashed the car.

“[A]n employer is liable for its employee’s tort only when the tortious act falls within the scope of the employee’s general authority in furtherance of the employer’s business and for the accomplishment of the object for which the employee was hired.” *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) (citing *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971)). The employee’s acts “must be of the same general nature as [the conduct] authorized or incidental to the conduct authorized” to be within the scope of employment. *Id.* (quoting *Smith v. M Sys. Food Stores, Inc.*, 297 S.W.2d 112, 114 (Tex. 1957)). Accordingly, “if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation.” *Id.* In the context of employer liability for an employee’s negligent driving, an employee driving on a personal errand is not in the course and scope of his employment. *See, e.g.*, *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756– 57 (Tex. 2007) (per curiam) (employee delivering tires to company who crashed while driving to convenience store to purchase cigarettes was not in course and scope of employment); *Drooker v. Saeilo Motors*, 756 S.W.2d 394, 397 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (employee driving employer’s delivery vehicle to his home for lunch at time of crash was not in course and scope of employment).

Appellants argue Miranda was not acting in the course and scope of his employment when he crashed the car. The testimony showed appellants authorized Miranda to drive the car from

where Fellman left it to a parking place in one of appellants' parking lots. Fanning testified Miranda drove the car past the last of appellants' parking lots and kept going until he crashed the car into a concrete pillar. Nothing in the record shows Miranda's failure to drive the car directly to a parking place was anything other than a joyride in Fellman's limited-edition, upgraded sports car. That joyride was not within the same general nature as the conduct authorized by appellants, nor was it incidental to the authorized conduct. The joyride was not in furtherance of appellants' business, nor was it "for the accomplishment of the object for which [Miranda] was hired." *See Minyard Food Stores*, 80 S.W.3d at 577. Instead, Miranda's joyride was a deviation "from the performance of his duties for his own purposes." *Id.* Appellants "are not responsible for what occurs during that deviation." *Id.* We conclude no evidence supports the trial court's finding that Miranda was acting in the course and scope of his employment when he crashed the car. Therefore, the trial court erred by imposing liability on appellants for Miranda's "intentional and knowingly deceptive act and unconscionable action."

We sustain appellants' third issue to the extent the judgment awarded Fellman treble damages, and we otherwise overrule the issue.

### Attorneys' Fees

Section 17.50(d) provides, "Each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." Bus. & Com. § 17.50(d). The trial court awarded Fellman $137,000 for his attorneys' fees through trial as well as additional amounts for appeal. Our disposition of appellants' third issue reduces the award of Fellman's damages from $30,486.13 to $4,672.85.[5] The supreme court has held that "unless an appellate court is 'reasonably certain that the jury was not significantly influenced by the erroneous amount of damages it considered,'

---

[5] These damages consist of the diminished value of the car ($2,975), the cost of the diminished-value appraisal ($275), Fellman's insurance deductible ($422.85), and Fellman's lost time ($1,000). It is also the trial court's finding of Fellman's total actual damages, $13,906.64, offset by appellants' $9,233.79 payment to Fellman's insurer.

the issue of attorney's fees should be retried if the damages awarded are reduced on appeal." *Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam) (quoting *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006)). This rule also applies when the trial court determines the award of attorneys' fees. *See id.* In this case, we have reduced the award of damages to less than one-sixth the amount awarded by the trial court. In this situation, "we cannot be reasonably certain that the trial court was not significantly affected by the error. Therefore, the case must be remanded to the trial court for a new trial on attorney's fees." *Id.* (citation omitted) (two-thirds reduction of damages required vacating and remanding award of attorney's fees).

## CONCLUSION

We reverse the trial court's judgment in part. We vacate the award of treble damages, and we render judgment that Fellman recover damages of $4,672.85. Having modified the award of damages, we vacate the award of prejudgment interest. *See Lee v. Lee*, 411 S.W.3d 95, 115–16 (Tex. App.—Houston [1st Dist.] 2013, no pet.). We also vacate the trial court's award of attorneys' fees. We remand the case to the trial court for further proceedings to determine the amount of Fellman's reasonable and necessary attorneys' fees and the amount of prejudgment interest. In all other respects, we affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

171277F.P05

–21–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PARKING COMPANY OF AMERICA
VALET, INC. AND PARKING
COMPANY OF AMERICA LOVE FIELD,
INC., Appellant

No. 05-17-01277-CV          V.

BRADLEY RYAN FELLMAN, Appellee

On Appeal from the County Court at Law
No. 3, Dallas County, Texas
Trial Court Cause No. CC-16-01273-C.
Opinion delivered by Justice Myers.
Justices Molberg and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** in part. The trial court's award of treble damages is **VACATED**, and judgment is **RENDERED** that appellee Bradley Ryan Fellman recover damages of $4,672.85 from appellants Parking Company of America Valet, Inc. and Parking Company of America Love Field, Inc., jointly and severally. The trial court's award of attorney's fees is **VACATED**. The trial court's award of prejudgment interest is **VACATED**. This cause is **REMANDED** to the trial court for determination of appellee Bradley Ryan Fellman's reasonable and necessary attorneys' fees and prejudgment interest. In all other respects, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 31st day of July, 2019.